Earle W. PINKHAM and Elizabeth F. Pinkham, Appellants,

v.

Lloyd P. SALYER, Appellee.

No. 1631.

Municipal Court of Appeals for the District of Columbia.

Argued May 16, 1955.

Decided July 6, 1955.

Rehearing Denied July 22, 1955.

Charles D. Sanger, Jr., Washington, D. C., with whom James T. Barbour, Jr., Washington, D. C., was on the brief, for appellants.

Mark P. Friedlander, Washington, D. C., for appellee.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

CAYTON, Chief Judge.

Salyer contracted to build a house for Mr. and Mrs. Pinkham in Montgomery County, Maryland, for $34,400. He obtained an excavation permit, applied for a building permit, ordered certain materials and expended labor in clearing the land and other work preliminary to actual construction of the house. Soon afterwards it was reported that the type of soil on the lot was not suited for a septic tank, which was called for in the plans and specifications. The owners then instructed Salyer to stop work and asked for his bill for work already performed. He submitted a statement for $2,371.98, listing various items of labor and materials. When the Pinkhams failed to pay he brought this action, and in a trial by the court obtained a decision approving his claim.

Mr. and Mrs. Pinkham bring this appeal, and assign as error the refusal of the trial court to grant their motion for judgment at the end of plaintiff's case and refusal of a similar motion at the close of all the evidence. In effect they ask us to rule that the judgment for plaintiff was wrong as a matter of law.

The plans and specifications, prepared by the owners' architect, prescribed that the builder was "to comply with all local ordinances * * * and meet the requirements of the building regulations of Montgomery County, Maryland." There was a provision as to a septic tank, reading: "It shall be installed complete in every manner to comply with the sanitary codes of Montgomery County, Maryland. These specifications are based on the assumption that the proration soil test will permit same."

The first question is whether Salyer should have been denied recovery because of alleged violations of his contract. The contract provided that the first payment (20% of the contract price) was to become due when the first floor joists were in place. That point, as we have seen, was never

reached. No part of the house was ever actually erected because when the septic tank obstacle was reported the Pinkhams cancelled the contract and announced that they would demand return of their purchase money from the seller of the lot. (This they did, as was revealed at the trial.) Salyer testified that it was at that meeting of the parties that defendants told him to submit his bill for work already performed and that they would pay it. There was no real contradiction of this testimony. Mr. Pinkham admitted asking Salyer for his bill and admitted that he told Salyer he did not want him to lose anything on the job, but said that he had not promised to pay the bill. Mrs. Pinkham's testimony was practically the same as her husband's.

On this set of facts it cannot be said that plaintiff was out of court as a matter of law. If his testimony was believed, as it apparently was by the trial judge, he had a right to recover. His recovery could be based either, (1) on the original contract, if it was breached through no fault of his, or (2) on the agreement for cancellation and the new and independent promise to pay for work already done. As to the first proposition, we think the evidence fully justified a decision that Salyer was not responsible for the collapse or abandonment of the project. When he came into the picture, the lot had already been bought and the plans and specifications drawn. We do not overlook the reference in the specifications to the "assumption that the proration soil test will permit same." But neither the specifications nor the contract provided that the builder was required to translate that assumption into a certainty. Nor was there any evidence of a trade usage or custom to that effect. We are aware of no rule of law that, absent a statutory or contractual obligation, requires a builder to investigate hidden subterranean conditions before signing a contract or embarking on a job. (Appellants advance this contention, but do not support it by argument or citation.) There was evidence that Salyer had checked and found that a septic tank was operating in the house next door, just 60 feet away. Fur-

thermore, Mr. Pinkham himself testified that when Salyer asked him about the subject, as the work was getting under way, he told Salyer that he had been told that the land had been cleared for septic tank purposes. Under all these circumstances we think it would be wrong to rule that Salyer was required to make a more exhaustive investigation of the soil condition.

■ In addition to their argument that they were not liable under the original contract, appellants take the position that there was no consideration for the "new" and independent promise to pay Salyer after they stopped the work. This position we cannot approve. The septic tank situation was unfortunate; but as we have already said, neither the situation nor the failure to discover it was due to fault of Salyer. The cancellation, which was mutually agreed to, was for the benefit of the Pinkhams and worked a detriment to Salyer. He had already spent close to $2,000 on the project, and presumably stood to make a profit when it was completed. He had also obligated himself to several subcontractors. It is plain that these factors constituted valid consideration for the new promise.

■ We turn now to the contention that Salyer has no right to recover because in ordering materials and performing the work he did, before actual issuance of a building permit, he was acting contrary to the terms of the specifications and in violation of the Montgomery County building code. The testimony was that Salyer obtained an excavation permit,[1] and had also applied for a building permit, and had then proceeded with the preliminary work we have described. It should perhaps be emphasized that Salyer had done no actual construction work when the project was stopped. But more important was his testimony that "he was requested by Mrs. Pinkham to move forward, as she was in a hurry," and that she "had called him prior to the beginning of his work and had requested him to go ahead as she was very anxious that the matter proceed quickly." Mrs. Pinkham did not deny these statements, but admitted that after the signing of the contract and after the application for building permit, she was on the site quite often and knew of the work Salyer had done, and that she had requested him to go forward with the work. It is therefore clear that in accelerating the work Salyer was acting not only with the consent, but on the active urging of one of the owners. Hence the owners should not be heard to complain that the work was unauthorized.

Affirmed.

---

1. A man who had formerly been Assistant County Attorney in Montgomery County testified that he had never heard of any law in that county authorizing an excavation permit for the construction of a dwelling house. But he admitted that he had no knowledge of the records in this particular transaction, and did not know whether an excavation permit had actually been issued or not.